Lloyd Crossen and Betty Crossen, Husband and Wife v. Commissioner.
Crossen v. Commissioner
Docket No. 36492.
United States Tax Court
T.C. Memo 1954-20; 1954 Tax Ct. Memo LEXIS 221; 13 T.C.M. (CCH) 406; T.C.M. (RIA) 54126; April 30, 1954, Filed *221 1. Respondent's deficiency determinations based on a reconstruction of net income by the bank deposits plus cash expenditures method are sustained. 2. Respondent properly imposed fraud penalties where petitioner restaurant operator deliberately furnished his bookkeeper with false figures for sales and purchases and did not inform the bookkeeper of cash withdrawals. Harrison W. Smith, Esq., for the petitioners. Robert E. Johnson, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion Respondent determined against petitioners the following income tax deficiencies and 50 per cent additions thereto for fraud: Additions
Year
Deficiency
to Tax
1946
$6,855.39
$3,427.70
1947
3,969.20
1,984.60
1948
1,194.52
597.26
In determining the above deficiencies, respondent relied principally on a reconstruction of petitioners' net income whereby yearly bank deposits, less nontaxable deposits, were added to expenditures of cash not reflected in deposits. The issues are (1) whether respondent erred in not including in his computations as a nontaxable bank deposit in 1946 the sum of approximately $7,000, which petitioners *222 claim they had in their safe deposit box on December 31, 1945; (2) whether respondent erred in adding to that portion of petitioners' bank deposits constituting taxable receipts the sum of $2,000 per year as representing unrecorded cash amounts withdrawn by petitioner Lloyd Crossen from his restaurant cash register and spent for personal purposes; and (3) whether any part of the tax deficiencies for each year was due to fraud with intent to evade tax within the meaning of section 293(b), Internal Revenue Code. Petitioners have apparently conceded that respondent's deficiency determinations are otherwise correct. Findings of Fact Some of the facts have been stipulated and are so found. Petitioners, husband and wife, are residents of Hillsboro, Ohio. They filed joint income tax returns for the years 1946, 1947, and 1948 with the collector of internal revenue for the district of Ohio. During the taxable years here involved Lloyd Crossen (hereinafter referred to as petitioner) supported his wife and three children. In May of 1942, petitioner opened and began to operate "Lloyd's Restaurant" in Hillsboro. From the opening of the restaurant until the end of *223 1943, petitioner recorded business transactions in a notebook from which an outside bookkeeper prepared the accounts. Petitioners filed a Federal income tax return for the year 1942 in which no tax was shown to be due; they filed no income tax returns for the years 1940, 1941, 1943 and 1944. In January, 1944, petitioner was drafted into the army as a private. His wife operated the restaurant from January to August, 1944, at which time a cook named John Dimar was prevailed upon to become a partner and manage the restaurant in petitioner's absence. Dimar hired an accountant from Columbus, Ohio, to keep the books of the partnership. In August, 1945, the partnership was dissolved because of disagreement between the two partners. As of August 1, 1945, petitioner acquired Dimar's interest in the partnership and once again became sole proprietor of the restaurant. Under the part time supervision of petitioner Betty Crossen, the restaurant was operated and managed by the employees from August, 1945, until the latter part of September, 1945, when petitioner was discharged as a private first class from the army. During the taxable years here involved, petitioner worked full time at the restaurant, *224 normally charged between 50 and 60 cents for a meal and had an average of seven employees to whom he paid the prevailing wage. At or about the time of the dissolution of the partnership in 1945, Amos G. Smith, a member of a bookkeeping firm, was asked to help appraise and make an inventory of the property of the restaurant. Shortly thereafter, Smith began to keep for the restaurant a single entry journal known as The Alexander Tavern System, to which Smith or his employees would post appropriate entries from information submitted by petitioner. The Alexander Tavern System had not been used prior to August 1, 1945, for the keeping of the restaurant's accounts. Throughout the taxable years herein involved, Smith kept this journal for petitioner and from it prepared petitioners' income tax returns, as well as the required social security and workmen's compensation reports. For these services, which did not include the auditing of petitioner's records, petitioner paid Smith $10 per month. From the books kept by the accountant hired by Dimar, Smith prepared a partnership return covering the first seven months of 1945, wherein there were reported gross sales or receipts of $30,395.14 *225 and a net profit of $5,987.03. In their personal return for the year 1945, petitioners reported a loss from the restaurant of $1,110.01 for the last five months of 1945. For the years 1946, 1947, and 1948, petitioners reported in their income tax returns net profits from the restaurant of, respectively, $4,409.15, $4,945.65, and $5,297.03. Petitioners' reported gross income for 1946 was $15,187.65. In either August, 1945, when petitioner was home on furlough, or shortly after his discharge from the army, Smith advised petitioner to supply Smith's bookkeeping firm with the figures for the restaurant's gross receipts and disbursements. Petitioner, at all times pertinent to this proceeding, knew that the information submitted by him to Smith would be the basis for the computation by Smith of petitioners' income tax. It was petitioner's practice to bring to Smith's office each month a slip of paper listing what Smith and his employees understood to be daily receipts or sales, a daybook itemizing cash pay-outs, and petitioner's check stubs. Often petitioner would not submit the slip of paper and, instead, would insert a figure opposite the date at the head of daily cash pay-out items *226 in the daybook. This figure was understood by Smith and his employees to represent sales or gross receipts. When petitioner brought in the slips and daybooks, he would make no representations regarding the nature of the figures contained therein. Petitioner usually supplied the cash pay-out figures on time, but was frequently late in furnishing sales figures. As employee of Smith had the job of posting the figures submitted by petitioner to the single entry journal. Whenever petitioner failed to submit sales figures on time, she would either call him for the desired information or go down to the restaurant to pick it up. While petitioners were in Florida in the early part of 1948, she, as authorized by petitioner, went regularly to the restaurant to pick up the cash register tapes, cash pay-out figures and currency, which she deposited in the bank. On these occasions she noticed that the cash register tape readings were higher by comparison than the figures which petitioner had been sending in and which she had been posting to the journal as sales. She informed Smith of her discovery. Smith told petitioner upon his return from Florida in 1948 that he (petitioner) would have to furnish *227 cash register tapes if he wanted his income tax returns prepared. Petitioner replied that he could not furnish tapes at that time since the cash register was broken. At no time during 1945 and the taxable years did Smith or any of his employees understand, nor were they advised by petitioner, that the amounts either on the slips or appearing at the top of the pages in the cash pay-out daybooks were to be, or should have been, added to the cash pay-outs to arrive at the gross receipts of the restaurant. In The Alexander Tavern System journal of Lloyd's Restaurant, the following monthly summaries of merchandise sales and merchandise purchases were compiled from information furnished by petitioner: YEAR 1946
Merchandise
Merchandise
Month
Sales
Purchases
January
$ 4,378.11
$ 4,205.53
February
3,647.80
5,126.57
March
4,445.71
5,324.94
April
3,448.80
6,382.67
May
4,031.75
5,510.89
June
3,762.28
5,750.07
July
4,020.86
8,115.98
August
3,521.70
4,803.42
September
7,136.47
3,683.03
October
14,302.88
980.78
November
10,768.39
273.72
December
11,447.98
1,028.52
$74,912.73 *
$51,186.12
YEAR 1947
January
$ 7,200.37
$ 4,335.19
February
5,861.77
4,558.67
March
6,250.74
4,033.14
April
5,025.86
5,381.97
May
6,579.91
5,079.57
June
6,505.79
5,707.11
July
5,294.49
5,080.87
August
4,976.75
5,065.10
September
4,858.87
4,783.65
October
6,419.74
November
52,554.55
2,760.69
December
4,755.14
$105,109.10 [1]
$57,960.84
YEAR 1948
January
$ 6,841.54
$ 3,801.22
February
7,004.99
5,423.53
March
7,783.22
4,908.59
April
6,716.39
5,292.15
May
7,723.53
4,057.90
June
8,088.79
4,201.32
July
7,670.15
4,264.86
August
6,191.70
4,465.73
September
6,165.76
3,970.03
October
6,715.28
4,895.48
November
7,000.14
3,331.82
December
6,058.85
3,688.76
$83,960.34
$51,851.39
*228 In adding up daily and monthly sales figures for 1946, Smith's firm made mathematical errors of addition with the result that the amount, $73,912.73, inserted as "Total receipts" in petitioners' 1946 income tax return was less by $4,900 than the actual total of the figures furnished during 1946 by petitioner. The figures posted as sales to the journal for the month of September, 1946, did not vary in daily amount by more than $10 from $295. Beginning on October 1, 1946, and continuing until the end of the year, the great majority of the amounts posted as sales ranged between $400 and $600 per day. The following table shows for each taxable year the *229 total receipts deposited in petitioners' checking and savings accounts, petitioner's expenditures for business and personal purposes, of receipts not accounted for in deposits, and receipts omitted from petitioners' income tax returns as shown by a comparison between receipts as corrected by respondent and receipts reported in the returns. 1946
1947
1948
Deposited receipts
$87,955.43
$90,530.35
$83,228.90
Expenditures of Non-Deposited Re-
ceipts for Business Purposes
3,000.00
5,300.00
6,667.30
For Personal Purposes
2,000.00
2,000.00
2,000.00
Receipts as Corrected
92,955.43
97,830.35
91,896.20
Receipts per Return
73,912.73
90,078.80
83,960.34
Receipts Omitted
$19,042.70
$ 7,751.55
$ 7,935.86
The net profit from the restaurant for the years 1946, 1947, and 1948 was in excess of that reported in petitioners' income tax returns by the amounts, respectively, of $19,042.70, $12,674.06, [2] and $7,171.54. The amounts set forth for 1947 and 1948 reflect not only omitted receipts but adjustments determined by respondent arising from the disallowance, as deductible expenses, of certain capital expenditures. *230 In December, 1942, petitioner borrowed $2,800 at interest from a building and loan company. This loan was discharged in September, 1943. Petitioners borrowed $100 from a local bank in 1942 and $75 in 1943, which amounts were repaid within three or four months. In November, 1945, petitioner borrowed $2,600 at interest from the same building and loan company, which loan was discharged about a year later. On January 2, 1946, petitioner borrowed $1,500 at interest from the same local bank and completed repayment of the loan by February 26, 1946. During the taxable years petitioner spent approximately $3,500 for improvements on his private residence. Some of the checks petitioner issued in payment for these improvements were recorded as business expenses in the single-entry journal kept by Smith's firm. In 1946, petitioner spent $4,000 to complete payment on a 35-acre farm, for which he made a down payment of $3,000 in 1945. Petitioner spent $6,000 for restaurant equipment and fixtures in 1946, $10,969.46 in 1947 and $2,173.68 in 1948. In 1946 petitioner bought a jeep automobile for $1,000, which he exchanged, together with $715.21, for a new jeep in 1947. In 1947 he bought a Packard *231 automobile for $2,400, which he traded in in 1948 for a new Packard costing $3,400. For part of 1946, petitioner also maintained a Chevrolet automobile. In the spring of 1950, an agent of the respondent called on petitioner and asked him for his business records for the years 1946 through 1948. Petitioner referred the agent to Smith, who showed him the journals for the years 1947 and 1948, cash pay-out books for 11 months of 1948 and some canceled checks. Smith told the agent that petitioner had the 1946 journal. When contacted again by the agent, petitioner said that the 1946 journal had been destroyed by water from a leak in the roof and thrown out. In the late summer of 1950, the 1946 journal, undamaged by water, was produced by petitioners' representatives at a conference with respondent's agents. During the course of the investigation, as well as at the hearing, petitioner admitted withdrawing money from the drawer of the restaurant's cash register, making no record of it in the cash pay-out book and failing to disclose the fact of such withdrawals to Smith or his employees. In June of 1950, respondent's agents showed petitioner an analysis of his bank deposits, together *232 with the eliminations and adjustments for nontaxable deposits, and asked him what other deposits, if any, represented funds not taken from the restaurant. Petitioner did not at this time, nor at subsequent conferences in 1950, claim that he had in his safe deposit box at the beginning of 1946 cash which he deposited in his checking account during that year. Petitioner admitted to the agents that he made money in excess of that reported in 1946 through 1948 and estimated that his net income for those years was between $10,000 and $12,000. Petitioner advised the accountant who prepared a net worth statement for presentation at the hearing that there was in his safe deposit box $9,000 in cash on January 1, 1946, and $1,000 on January 1, 1947. At the hearing of this proceeding, petitioners testified that on January 1, 1946, there was in the safe deposit box cash and government bonds in the approximate total amount of $7,000 and that no amount was left in the box as of January 1, 1947. Part of the deficiencies for each of the years 1946, 1947, and 1948 was due to fraud on the part of petitioner with intent to evade tax. Opinion VAN FOSSAN, Judge: Respondent reconstructed petitioners' *233 net income by the so-called bank deposits method. He took total yearly deposits, subtracted therefrom nontaxable deposits, added expenditures of business receipts not reflected in the bank deposits, and arrived at a figure representing total taxable receipts. For each of the taxable years here involved, receipts as computed by respondent exceeded those reported by petitioners in their income tax returns. Petitioners do not question respondent's resort to the bank deposits method of reconstructing their income, and concede that, in each of the years involved, the receipts from the restaurant operated by petitioner [3] were understated to some extent. Petitioners contend, however, that respondent erred when he did not include as a nontaxable deposit for the year 1946 the sum of $7,000, which petitioners claim they had in a safe deposit box at the beginning of 1946 and deposited in their checking account during that year. Petitioners further contend that respondent erred when he attributed to petitioner the expenditure for personal purposes of undeposited business receipts in the amount of $2,000 per year, which sum constituted part of the yearly total of unreported receipts on which tax *234 deficiencies were determined. With respect to the first two questions before us, petitioners have the burden of overcoming the presumption of correctness attaching to respondent's deficiency determinations. To prevail on the first issue, petitioners must prove by a preponderance of the evidence (1) that their safe deposit box contained the sum of $7,000 on December 31, 1945, and (2) that such sum was deposited during the following year in their checking account. We do not think they have met their burden. Petitioners' testimony on this issue was vague and unconvincing. On direct examination petitioner Lloyd Crossen conveyed the impression that most, if not all, of the alleged $7,000 came from cash savings that he and his wife had accumulated over the years by putting money in a glass bank at home. However, on cross examination, he did not refer to the glass bank, but testified instead that all but $1,000 of the money allegedly in the safe deposit box at the close of u945 was derived from what his wife, during his absence in the Service, had saved from his army pay ( $500), army allotment checks ($2,000) *235 and restaurant earnings ($3,500). Later in the hearing, petitioner mentioned that the box contained an additional $300, representing the proceeds of his mustering out pay checks. Petitioner Betty Crossen attempted to corroborate her husband's testimony, but admitted finally that she did not know how much in either cash or government bonds was in the box on the critical date. The implausibility of petitioners' story is heightened, we think, by the fact of petitioner's borrowings at interest at the end of 1945 and the beginning of 1946. It is unreasonable to find that a person in petitioner's circumstances would borrow and pay for the use of money when he had adequate non-income producing funds of his own ready at hand. Furthermore, even if we were convinced which we are not, that $7,000 was in the safe deposit box at the end of 1945, there is very little evidence upon which to base an inference that such amount was deposited, as alleged, in petitioners' checking account during the year 1946. Aside from the fact that petitioners' evidence was in part contradictory with regard to the amount left in the box at the end of 1946, their own witness, an accountant, admitted that in his examination *236 of petitioners' records and bank statements he was unable to trace the alleged transfer of the $7,000 into the checking account. Finally, we feel that petitioner's failure to advise respondent's agents of such a transfer, though given ample opportunity to do so during the latters' investigation in 1950, casts further doubt on the veracity of petitioners' claim. We are unable to find that petitioners had on hand any such sum of $7,000. Accordingly, we hold that petitioners have failed in their attempt to prove that respondent was in error. The second issue before us involves the reasonableness of respondent's estimate that petitioner withdrew each year from the restaurant cash register the sum of $2,000 in cash which, without first depositing, he spent for purposes not connected with his business. Petitioners have adduced no evidence showing in what respects this estimate was arbitrary or unreasonable. Therefore, on this issue, as in the first, we hold for respondent. We turn next to the issue of fraud. Here the burden is on the respondent to prove by clear and convincing evidence that petitioners, or either of them, [4] intended at the time they filed their returns to defraud the *237 government of tax legally due. Respondent charges that in each of the years in question petitioner Lloyd Crossen deliberately understated the restaurant's gross receipts in submitting the figures to the bookkeeping firm for recordation in The Alexander Tavern System single-entry journal. It was from this journal that the bookkeeping firm prepared petitioners' income tax returns. Petitioners concede that gross receipts, or sales, were understated in the journal, but deny that petitioner intended such a result. On the contrary, petitioners contend that the understatements were due to the bookkeeping firm's failure to add cash pay-outs to the figures which petitioner listed either on separate slips of paper or opposite the date at the head of the page in the daybook itemizing daily cash pay-outs. According to petitioners, the latter figures, i.e., those either on *238 the slips or at the top of the pages in the cash pay-out book, represented the amounts of cash left in the cash register at the end of the day. Therefore, petitioners claim, if the bookkeeping firm's employees had added these alleged cash balance figures to cash pay-outs, they would have arrived at a correct figure for daily sales. Thus, it is petitioners' position that the responsibility for the omission of receipts from their tax return lies not with them, but with their bookkeeper. Petitioners' explanation of the disparity between actual and reported receipts is not tenable. We have found as a fact that Smith explicitly told petitioner to submit figures representing gross receipts. Neither Smith nor his employees ever understood that the figures in question represented anything other than gross receipts. It seems incredible that for more than three years petitioner and his bookkeeper each had a different conception of the identity of these larger figures. It is our conviction that petitioner's identification of these figures as cash balances is deliberately false and that conclusive evidence of this deception is to be found in the record. This evidence consists of the entries, *239 and the inferences to be drawn therefrom, in the journals summarizing the restaurant's sales and purchases for the respective years involved. It will be noted that for the first eight months of 1946 monthly sales averaged between $3,000 and $4,000, somewhat less than purchases during the same period. Then, suddenly, sales jumped in October to over $14,000 and stayed above $10,000 for each of the remaining two months of the year. Instead of rising with the sales, merchandise purchases dropped to a monthly average of less than $1,000 for the last three months of the year. Again in 1947, the average monthly sales for the first nine months of the year were substantially below the average for the closing three months. And as in 1946, last quarter purchases fell off, though not as drastically. It is significant that in 1948, the year in which an employee of the bookkeeping firm discovered the disparity between cash register tape readings and the figures previously submitted by petitioner, there is no such sharp increase in last quarter sales. The inference to be drawn from these journal entries is, in our opinion, the inescapable one that petitioner was deliberately manipulating the sales *240 figures in order to produce a taxable net income of approximately $4,500 per year. Any possible reconciliation between petitioners' contention and the journal entries is negatived by the manifest incongruity of the comparatively huge upswing in business during the last quarter of 1946 and 1947. Petitioner accounts for this wide monthly disparity by stating that there was a street fair in his town each fall, with a consequent increase in business. This statement is completely negatived by the fact that the street fair only lasted for one week. That such an increase in sales did not actually occur is shown, we think, not only by the 1948 journal entries but also by petitioners' 1945 income tax return. In this return the restaurant's net profit for the first seven months of 1945 was reported as $5,987.03, whereas for the rest of the year under the sole proprietorship of petitioner the business is shown to have suffered a loss of $1,110.01. If sales did not in fact rise sharply in the fall of 1946 and 1947, it follows that petitioner was not submitting cash balance figures, which can normally be expected to bear a fairly direct relationship to sales. Thus it is clear that petitioner, having *241 understated sales so flagrantly during the first nine months of the years 1946 and 1947, was compelled to overstate sales and understate purchases for the balance of those years to insure that some net profit would be reported in his income tax returns. As for 1948, petitioner was merely careful to understate sales evenly throughout the year. Additional evidence of fraud may be found in the failure of petitioner to notify the bookkeeping firm of his sizable withdrawals of cash from the drawer of the restaurant cash register. We are convinced that petitioner was well aware that by omitting to record the amounts of such withdrawals his income as reported in the income tax returns would be understated accordingly. In view of the foregoing and upon the whole record, we hold that part of the deficiencies for each of the years here involved was due to the fraudulent intention of petitioner Lloyd Crossen to evade payment of income tax. Fraud having been established in respect of the year 1946, we would need give no consideration to the question, belatedly raised on brief, whether the statute of limitations should operate to bar the assessment of the deficiency for that year. To be available *242 as a defense, a plea of the statute of limitations must both be pleaded and proved. Furthermore, section 275(c), Internal Revenue Code, which extends the period of the statute in cases where the income omitted exceeds 25 per cent of the gross income reported in the return, is applicable to this case. Since we have found that petitioners' unreported income for 1947 was $12,674.06, instead of $12,702.06 as determined by respondent, a Rule 50 computation is necessary. Decision will be entered under Rule 50. Footnotes
*. This column of figures was incorrectly totaled by the bookkeeping firm as $73,912.73, which was inserted in the petitioners' income tax return. ↩
1. This total reflects the inclusion of the figure $52,554.55, which purports to represent the sales for the last three months of 1947. It is to be noted that no daily postings of sales for these months were made in the journal and that the figure actually appearing in the "totals" box on the page of the journal setting forth the above listed sales figures for 1947 is $90,078.80.↩
2. This figure is $28 less than that determined by respondent, which difference is based on a discrepancy between omitted receipts as set forth in the notice of deficiency and omitted receipts as proven at the hearing.↩
3. "Petitioner", in the singular, refers to petitioner Lloyd Crossen.↩
4. Where joint returns are filed the wife may be held liable for the fraud penalty even though fraudulent intent on her part is not proved. Myrna S. Howell, 10 T.C. 859; Kann v. Commissioner, Fed. (2d) , affirming 18 T.C. 1032↩ (wife liable for fraud even though she did not sign joint return).